KING & SPALDING LLP
Mark W. Wege
Eric M. English
1100 Louisiana, Suite 4000
Houston, Texas 77002
Telephone: (713) 751-3200
Facsimile: (713) 751-3290

KING & SPALDING LLP
Scott I. Davidson
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222

*Proposed Bankruptcy Counsel for the Debtor*

**IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
POUGHKEEPSIE DIVISION**

---------------------------------------------------------x
In re:                                    Chapter 11

**SPECTRAWATT, INC.,**                    Case No. 11-37366-CGM

                                     **Debtor.**
---------------------------------------------------------x

**DEBTOR'S EMERGENCY MOTION PURSUANT TO 11 U.S.C. §§ 105, 361 AND 363
FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO USE
CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO THE SERIES
A-1 NOTEHOLDERS, AND (III) SCHEDULING A FINAL HEARING PURSUANT TO
<u>BANKRUPTCY RULE 4001</u>**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

      SpectraWatt, Inc., the above-captioned debtor-in-possession (the "<u>Debtor</u>"), hereby

moves this Court (the "<u>Motion</u>") on an emergency basis for entry of Interim and Final Orders (I)

authorizing the Debtor to use cash collateral, (II) granting adequate protection to the Series A-1

Noteholders, and (III) scheduling a final hearing pursuant to Rule 4001(b) of the Federal Rules

16095732

of Bankruptcy Procedure (the "Bankruptcy Rules").  In support of this Motion, the Debtor respectfully represents as follows:[1]

## SUMMARY OF RELIEF REQUESTED[2]

i. <u>Parties with an Interest in Cash Collateral</u>: The parties with an interest in the Cash Collateral are the Series A-1 Noteholders.  Motion at ¶ 9; Interim Order at ¶ 3.

ii. <u>Purpose for Use of Cash Collateral</u>: The Debtor seeks authorization to use Cash Collateral to preserve the value of estate assets, to ensure that adequate funds are available for normal and customary business expenses and operating needs, and to take steps to effectuate a sale of its assets pursuant to Bankruptcy Code Section 363.  Motion at ¶ 11; Interim Order at ¶ 5.

iii. <u>Material Terms for Use of Cash Collateral</u>: The Series A-1 Noteholders have agreed to the Debtor's use of all Cash Collateral for the purposes set forth in the Budget, subject to the Debtor providing them with the adequate protection proposed herein.  Motion at ¶ 11.

   a. <u>Carve-Out</u>: All prepetition and postpetition liens held by the Series A-1 Noteholders, in addition to any super-priority claim of the Series A-1 Noteholders, will be subject in all respects to a Carve-Out which will include: (i) all accrued and unpaid fees and costs of the Debtor's professionals (including the Debtor's CRO, attorneys, accountants and other professionals retained in this case by the Debtor) up to the budgeted amount; (ii) all amounts provided for and paid pursuant to any order approving interim fee procedures or authorizing payments to ordinary course professionals; (iii) fees payable to the Court; (iv) fees payable to the United States Trustee; and (v) $100,000.  The Carve-Out shall have effect nunc pro tunc to the Petition Date and shall continue through the duration of this case.  Motion at ¶ 13; Interim Order at ¶ 15.

iv. <u>Adequate Protection</u>:

   a. <u>Maintenance of the Pre-Petition Collateral</u>.  The Debtor will maintain the value of the Pre-Petition Collateral by using the Cash Collateral to continue to preserve and protect the Debtor's assets and pursue a prompt sale of such assets; Motion at ¶ 22.

---

[1] Capitalized terms not defined in this Motion are defined in the proposed Interim Order attached hereto as Exhibit A.

[2] Capitalized terms not defined in this Summary of Relief Requested section are defined elsewhere in the Motion.

b. <u>Super Priority Administrative Expense</u>. Subject to the Carve-Out, the Series A-1 Noteholder Agent and the Series A-1 Noteholders shall have a super priority administrative expense claim. Motion at ¶ 22; Interim Order at ¶ 11.

c. <u>Replacement Liens</u>. Subject in all respects to the Carve Out, the Debtor will provide the Series A-1 Noteholders with post-petition replacement liens, to the extent of any post-petition diminution in value of the Pre-Petition Collateral on (y) all of the Debtor's post-petition property of the same kind or character as the Pre-Petition Collateral, and (z) any proceeds or profits from the Pre-Petition Collateral. Motion at ¶ 22; Interim Order at ¶ 9, 10, 12.

v. <u>Termination Provisions</u>

a. <u>Events of Default</u>. Any of the following shall constitute an event of default: (i) the Debtor's failure to obtain entry of a Final Order within thirty (30) days of the entry of the Interim Order; (ii) the issuance of an order staying, reversing, modifying or vacating the Interim Order; (iii) the Debtor's failure to obtain entry of a bid procedures order by September 30, 2011 in a manner acceptable to the Series A-1 Noteholder Agent; (iv) absent the prior written consent of the Series A-1 Noteholder Agent, the Debtor's failure to obtain approval of an asset sale under Bankruptcy Code section 363 by October 31, 2011; (v) the entry of an order dismissing the Debtor's chapter 11 case, converting the case to chapter 7, or appointing a chapter 11 trustee or an examiner with expanded powers in the case; (vi) any action by the Debtor, including the filing of an application, in support of any of the foregoing Events of Default; (vii) the breach by the Debtor of any term or provision of the Interim Order or any further cash collateral order; (viii) the acquisition by any post-petition lender to the Debtor of a post-petition security interest in or lien upon any property of the Debtor having parity with or priority over the security interest and liens in such property held by the Series A-1 Noteholder Agent or any Series A-1 Noteholder; or (ix) the entry of an order by any court that terminates the authority of the Debtor to conduct all or any material part of its business. Interim Order at ¶ 17.

b. <u>Termination.</u> Absent consent from the Series A-1 Noteholders, the Debtor's authorization to use Cash Collateral, the Prepetition Collateral, or the Post Petition Collateral, shall terminate upon the occurrence of the Termination Date, which would occur upon: (i) expiration of the period covered by the Budget, or (ii) the occurrence of an Event of Default, the filing and service of the Default Notice and the time provided for such service as provided in the Interim Order. Upon filing and serving a Default Notice, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified, following **seven (7) days** after the Default Notice, to the extent necessary for the Series A-1 Noteholder Agent and the Series A-1 Noteholders to exercise any rights and remedies provided under the terms of the Order and/or the Prepetition Loan

Documents, and terminating the Debtor's authorization to use Cash Collateral following **five (5) days notice**, other than for the Carve-Out or claims provided in the Budget which have accrued up to the Termination Date. Motion at ¶ 14; Interim Order at ¶ 23.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this case and this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) & (M). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## BACKGROUND

### A. Background of the Debtor's Business

2. On August 18, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is authorized to operate its businesses and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. The Debtor is a developer and manufacturer of advanced crystalline silicon cells used in the generation of solar electricity (the "Business"). The Debtor was formed in June 2008 with certain intellectual property and other assets acquired from Intel Corporation, together with a $50 million capital contribution from certain investors. Since that time, the Debtor has developed, manufactured and distributed silicon solar cells for use in solar modules. The Debtor has also engaged in substantial research and development in the solar cell field. The Debtor's goal was to improve upon current solar cell technology and enable solar-generated electricity to compete, on an unsubsidized basis, with conventional sources of electricity.

4. In 2009, the Debtor relocated its corporate headquarters from Hillsboro, Oregon to Hopewell Junction, New York to take advantage of incentives provided by the New York State Energy Research and Development Authority and to access the region's large skilled workforce. The Debtor leases facilities at IBM's Hudson Valley Research Park, 2070 Route 52, Bldg 334 Zip 23A, Hopewell Junction, New York 12533 (the "New York Facility"), where the Debtor constructed a state-of-the-art manufacturing facility seeking full-scale production capacity of over two hundred (200) megawatts of production per year.[3] The Debtor began operating the New York Facility in January 2010 at an initial capacity of thirty (30) megawatts per year.

5. Due to defects in vendor-supplied silicon wafers that were a key component of its products and certain defects in production equipment, the Debtor faced delays and the quality of the Debtor's finished products failed to meet purchaser specifications.[4] As a result, the Debtor was forced to sell a large quantity of its finished products at reduced prices and, accordingly, the Debtor suffered from lost revenues. The Debtor's inability to produce finished products at the required specifications also led to customer defections. Ultimately, the Debtor was able to resolve some of these problems and/or replace certain of its suppliers, but the financial difficulties caused by these problems contributed to the Debtor's inability to obtain additional financing in late 2010 (which would have allowed the Debtor to continue production), or to obtain a strategic equity partner.

---

[3] Production of solar cells is measured in megawatts per year. Two hundred (200) megawatts per year is equivalent to approximately fifty million (50,000,000) wafers.

[4] These defects will likely be the subject of future litigation or potential settlements of disputes the Debtor has with certain of its key suppliers and service providers.

6. The defects in the Debtor's production equipment and silicon wafers severely impacted the Debtor's business at the crucial early stages of production when the Debtor could ill-afford such major setbacks. The Debtor, given the production issues caused by these problems and without access to additional financing, announced in late December 2010 that it would close its manufacturing facilities. By the end of March 2011, the Debtor had completed the shut-down of its manufacturing facilities and laid-off all of its workforce in New York and Oregon. The Debtor subsequently closed its remaining Oregon operations and has liquidated its physical assets in Oregon. Following the termination of its employees, the Debtor rehired six (6) of its previous employees, giving them additional responsibilities.[5] Although the Debtor has ceased its manufacturing activities, the Debtor continued over the last several months to fill orders for its completed product inventory, leaving virtually no remaining finished goods inventory as of the Petition Date.

### B. The Debtor's Capital Structure

7. At the time of the 2008 spin-off from Intel, the Debtor raised $50 million from the issuance of "Series A" preferred stock (the "<u>Series A Shares</u>") to certain investors including Solon AG, Intel Corporation, Intel Capital Corporation, PCG Clean Energy & Technology Fund LLC, PCG Clean Energy & Technology Fund (East) LLC, and Cogentrix Energy, LLC (collectively, the "<u>Investors</u>").[6] These funds were used for a variety of purposes, including to finance working capital needs, to obtain a lease and commence the initial construction of the New York manufacturing facility, and to develop the Debtor's intellectual property. In addition

---

[5] As of the Petition Date, the Debtor has five (5) employees.
[6] $44.6 million in cash was raised from the issuance of the Series A Shares, and the remaining portion of the capital raised from the issuance of the Series A Shares was in the form of non-cash assets.

to preferred stock, the Debtor has also issued shares of common stock and options as employee incentives.

8. Pursuant to a Loan and Security Agreement dated December 21, 2009 (the "Series A-1 Loan Agreement") and related agreements, the Debtor has issued senior secured convertible notes with a five-year maturity (the "Series A-1 Notes"). The holders of the Series A-1 Notes include: (a) certain of the original Investors or their affiliates (PCG Clean Energy & Technology Fund, LLC, and PCG Clean Energy & Technology Fund (East), Cogentrix Energy, LLC, and Middlefield Ventures, Inc., who is an affiliate of original Investor Intel Corporation); (b) Roth & Rau AG ("Roth & Rau") (an equipment vendor), and (c) Crystalox Ltd. (a raw materials supplier), through an escrow agent (collectively, the "Series A-1 Noteholders"). The Series A-1 Loan Agreement provided for the Debtor to issue up to $41.4 million in Series A-1 Notes to the Series A-1 Noteholders in the proportions, and on the terms, stated therein.[7] As of the Petition Date, the Debtor has issued approximately $36.7 million (principal amount) of Series A-1 Notes. Proceeds from the Series A-1 Notes were used to fund operations, research and development, and construction of the New York manufacturing facility, among other things, along with acquisition of equipment.

9. The Series A-1 Notes are secured by valid, enforceable, perfected and unavoidable first liens (the "Pre-Petition Liens") on substantially all of the Debtor's assets (the "Pre-Petition Collateral"), but is subject to alleged purchase money security interests on certain

---

[7] For example, the Investor Series A-1 Noteholders agreed to lend up to $20 million to the Debtor in exchange for Series A-1 Notes in that amount, Roth & Rau agreed to accept up to $15 million in Series A-1 Notes in lieu of cash payments allegedly owed or becoming due and owing under an existing capital equipment agreement, and Crystalox Ltd. agreed to allow the Debtor to take $6.4 million from an escrow account established by a pre-existing supply contract between the parties in exchange for Series A-1 Notes issued into the escrow account.

equipment, as described below.[8] These liens have been duly perfected by timely UCC filings made by Middlefield Ventures, Inc. (the "Series A-1 Noteholder Agent"), one of the Series A-1 Noteholders, in its capacity as agent for all of the Series A-1 Noteholders.[9]

10. In addition to the Series A-1 Notes, the Debtor's debt structure is comprised of certain debt allegedly secured by a purchase money security interest related to the purchase of capital equipment from Roth & Rau AG. To the best of the Debtor's knowledge, this alleged equipment lien does not extend to Cash Collateral. The Series A-1 Noteholders are the only entities that assert a lien on the Debtor's Cash Collateral.

**RELIEF REQUESTED**

11. Pursuant to Bankruptcy Code sections 105, 361, and 363, the Debtor seeks authority on an interim and final basis to use all of its cash that is asserted to be cash collateral (as defined in 11 U.S.C. § 363(a)) (the "Cash Collateral"), to grant adequate protection to the Series A-1 Noteholders, and to schedule a final hearing pursuant to Bankruptcy Rule 4001. The Debtor requires the use of cash post-petition in order to maintain the value of its assets pending a sale and to ensure that adequate funds are available for normal and customary business expenses and operating needs. Following good faith and arm's length negotiations, the Series A-1 Noteholders have agreed to the Debtor's use of cash collateral on the terms of the Budget attached hereto, subject to adequate protection as provided for herein and as further described in the Interim Order.

12. Part of the Debtor's request for authority to use Cash Collateral is the request for

---

[8] However, the Debtor reserves all rights as against Roth & Rau and Crystalox.
[9] Except for the Carve-Out (defined below), nothing in this Motion shall affect the Series A-1 Noteholders' liens on the Pre-Petition Collateral.

16095732     8

this Court to schedule an Interim Hearing and to immediately authorize the use of Cash Collateral, pursuant to Bankruptcy Rule 4001(b)(2). The Debtor is only seeking emergency relief in the Interim Order to the extent necessary to preserve the Debtor's immediate viability and avoid irreparable harm, based on the expenses provided in the Budget. It is essential for the Debtor to use Cash Collateral to maintain the value of its assets, pay remaining employees and take steps to complete a sale process that will maximize value for all stakeholders. The Debtor needs immediate access to cash to fund working capital and to achieve these objectives, and will suffer irreparable harm without immediate relief. Accordingly, the Debtor requests that, pending the Final Hearing, the Court schedule the Interim Hearing as soon as practicable to consider and approve the Debtor's request for authorization to use Cash Collateral, in accordance with and pursuant to the terms and conditions contained in the Interim Order.

13. All prepetition and postpetition liens held by the Series A-1 Noteholders, including the adequate protection liens proposed to be provided by this Motion, in addition to any priority or super-priority claim that the Series A-1 Noteholders might possess or acquire, pursuant to 507(b) of the Bankruptcy Code or otherwise, will be subject in all respects to a carve-out (the "Carve Out") which will include: (a) all accrued and unpaid fees and costs of the Debtor's professionals (including the Debtor's CRO, attorneys, accountants and other professionals retained in this case by the Debtor) up to the budgeted amount; (b) all amounts provided for and paid pursuant to any order approving interim fee procedures or authorizing payments to ordinary course professionals; (c) fees payable to the Court; (d) fees payable to the United States Trustee; and (e) $100,000. The Carve-Out shall have effect nunc pro tunc to the Petition Date and shall continue through the duration of this case. The Carve-Out does not

provide for any creditor's committee because no committee is expected to be appointed, given the extremely small number of general unsecured creditors, totaling only seven (7), and the small amount of their claims. The Carve-Out is further defined in the Interim Order.

14. Consistent with the provisions of Local Rule 4001-2(c), the Interim Order provides that, absent consent from the Series A-1 Noteholders, the Debtor's authorization to use Cash Collateral, the Prepetition Collateral, or the Post Petition Collateral, shall terminate upon the occurrence of the Termination Date, which would occur upon: (i) expiration of the period covered by the Budget, or (ii) the occurrence of an Event of Default (as defined in the Interim Order and summarized in the Summary above), the filing and service of the Default Notice and the time provided for such service as provided in the Interim Order. Upon filing and serving a Default Notice, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified, following **seven (7) days** after the Default Notice, to the extent necessary for the Series A-1 Noteholder Agent and the Series A-1 Noteholders to exercise any rights and remedies provided under the terms of the Order and/or the Prepetition Loan Documents, and terminating the Debtor's authorization to use Cash Collateral following **five (5) days notice**, other than for the Carve-Out or claims provided in the Budget which have accrued up to the Termination Date.

15. The Debtor does not oppose any party in interest reviewing the liens of the lenders within a sixty (60) day time period following entry of the Interim Order, and any stipulation by the Debtor with respect to the liens held by the Series A-1 Noteholders shall not be binding on any other party.

16. The Series A-1 Noteholders may elect to seek the following in a final Cash

Collateral order: (i) liens on avoidance actions; (ii) waivers of rights under Bankruptcy Code section 506(c) and 522(b); and (iii) a 60-day limit on actions to avoid liens held by the Series A-1 Noteholders. The Debtor believes that items (i) or (ii), if requested, would not be appropriate.

## BASIS FOR RELIEF REQUESTED

### A. Cash Collateral and Adequate Protection

17. The Debtor seeks to use Cash Collateral commencing immediately upon the Court's entry of the Interim Order. The Debtor requires access to its cash and proceeds of any existing accounts receivable and any remaining inventory to preserve the value of its estate and administer this case. The Cash Collateral will be used by the Debtor to the extent necessary to meet its working capital needs, as detailed in the Budget, attached hereto as Exhibit B. The Debtor believes that the Budget will be adequate to pay all administrative expenses due or accruing during the period covered by the Budget.

18. Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell, or lease cash collateral unless: "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

19. Section 363(e) of the Bankruptcy Code further provides that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

20. The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis. *In re Mosello,* 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996). The

Bankruptcy Code does not define adequate protection but lists several examples of acceptable forms: (1) cash payments to the extent of any decrease in the value of a secured creditor's interest in collateral (2) replacement liens to the extent any decrease in the value of a secured creditor's interest in collateral and (3) other relief, other than an administrative expense claim, that provides the secured creditor with the indubitable equivalent of such entity's interest in the collateral. 11 U.S.C. § 361; *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) ("The concept of 'adequate protection' is not defined in the [Bankruptcy] Code except by the implications of the examples of adequate protection listed in § 361."). The examples listed in Section 361 are non-exclusive and other factors, such as maintenance of the value of the collateral, can provide adequate protection. *See, e.g., In re Beker Indus. Corp.*, 58 B.R. at 736; *In re Briggs Transp. Co.*, 780 F.2d 1348, 1349-50 (8th Cir. 1985).

21. As the legislative history of section 361 makes clear, the purpose of adequate protection "is to insure that the secured creditor receives the value for which the creditor bargained for prior to the debtor's bankruptcy." *See In re WorldCom, Inc.*, 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004). "However, neither the legislative history nor the Bankruptcy Code require the Court to protect a creditor beyond what was bargained for by the parties." *Id.* at 619; *see Beker*, 58 B.R. at 741 ("Adequate protection, not absolute protection, is the statutory standard.").

22. The Series A-1 Noteholders have consented to the Debtor's use of Cash Collateral, on the terms provided in the proposed Interim Order attached hereto as Exhibit A and as outlined in this Motion. The Debtor intends to provide adequate protection to the Series A-1 Noteholders for the use of Cash Collateral by (i) maintaining the value of the Pre-Petition

Collateral by using the Cash Collateral to continue to preserve and protect the Debtor's assets and pursue a sale of such assets; (ii) subject in all respects to the Carve Out, providing the Series A-1 Noteholders with post-petition replacement liens, to the extent of any post-petition diminution in value of the Pre-Petition Collateral on (y) all of the Debtor's post-petition property of the same kind or character as the Pre-Petition Collateral, and (z) any proceeds or profits from the Pre-Petition Collateral; and (iii) a super-priority administrative expense, subject to the Carve-Out, as further described in the Interim Order.

23. The Debtor submits that the adequate protection recited above and offered by the Debtor provides the Series A-1 Noteholders with adequate protection of their interest in the Cash Collateral. Thus, the Court should permit the Debtor to use Cash Collateral as requested herein and as provided in the Budget.

### B. Basis for Immediate Interim Relief

24. Pending the Final Hearing, the Debtor requests an immediate Interim Hearing. The Debtor requires immediate use of Cash Collateral in order to maintain the value of its assets and to fund costs associated with completing a sale of substantially all of the Debtor's assets. Absent the immediate use of Cash Collateral, the Debtor will be unable to pay ongoing operational expenses and expenses related to a proposed sale transaction. Consequently, if interim relief is not obtained, the Debtor's ability to maximize the value of its estate through a successful asset sale will be jeopardized and the Debtor could also be forced to immediately liquidate. Thus, the Debtor's need for access to the Cash Collateral, on the terms set forth in the Budget, is urgent.

25. Bankruptcy Rule 4001(b) permits the Court to approve a debtor's request for

financing during the 15-day period following the filing of a motion requesting authorization to obtain post-petition financing, "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." FED. R. BANKR. P. 4001(c)(2). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g., In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990). After the 15-day period, the request for financing is not limited to those amounts necessary to prevent destruction of a debtor's business. A debtor is entitled to borrow those amounts that it believes prudent in the operation of its business. *See, e.g., id.* at 36; *In re Simasko Prod. Co.,* 47 B.R. 444, 449 (Bankr. D. Colo. 1985).

26. For the foregoing reasons, the Debtor believes that granting the relief requested herein is appropriate and in the best interests of its estate.

### C. Request for a Final Hearing

27. Pursuant to Bankruptcy Rules 4001(b)(2), the Debtor respectfully requests that the Court set a date for the Final Hearing on 21 days notice following the Petition Date and approve the provisions for notice of the Interim Cash Collateral Order and the objection procedures that are set forth therein.

### NOTICE

28. Notice of this Motion has been given to: (i) the Office of the United States Trustee for this district and division; (ii) the Series A-1 Noteholder Agent, (iii) counsel for the Series A-1 Noteholder Agent; (iv) each of the secured lenders a party to the December 21, 2009 Loan and Security Agreement; (v) each of the Debtor's unsecured creditors; and (vi) all other parties on the master service list proposed by the Debtor for this case.

## NO PRIOR REQUEST

29.     No prior request for the relief sought in this Motion has been made to this or any other court in connection with this Chapter 11 case.

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, the Debtor requests this Court to enter Interim and Final Orders granting the relief requested and such other and further relief as the Court may deem just and proper.

Dated: August 19, 2011
         New York, New York

**KING & SPALDING, LLP**

By: /s/ Mark W. Wege
    Mark W. Wege
    MWege@kslaw.com
    Eric M. English
    EEnglish@kslaw.com
    1100 Louisiana, Suite 4000
    Houston, Texas 77002
    Telephone:  (713) 751-3200
    Facsimile:  (713) 751-3290

    -and-

    Scott I. Davidson
    SDavidson@kslaw.com
    1185 Avenue of the Americas
    New York, New York 10036
    Telephone:  (212) 556-2100
    Facsimile:  (212) 556-2222

    **PROPOSED BANKRUPTCY COUNSEL TO THE DEBTOR**