KING & SPALDING LLP
Mark W. Wege
Eric M. English
1100 Louisiana, Suite 4000
Houston, Texas 77002
Telephone: (713) 751-3200
Facsimile: (713) 751-3290

KING & SPALDING LLP
Scott I. Davidson
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222

*Proposed Bankruptcy Counsel for the Debtor*

# IN THE UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK
# POUGHKEEPSIE DIVISION

--------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| **SPECTRAWATT, INC.,** | Case No. 11-37366-CGM |
| **Debtor.** | |

--------------------------------------------------------x

### DEBTOR'S MOTION PURSUANT TO 11 U.S.C. §§ 105, 363 AND 365 FOR ENTRY OF ORDERS (A) AUTHORIZING AND SCHEDULING AN AUCTION AT WHICH THE DEBTOR WILL SOLICIT THE HIGHEST OR BEST BID(S) FOR THE SALE OF SUBSTANTIALLY ALL OF ITS ASSETS, (B) APPROVING PROCEDURES RELATED TO THE CONDUCT OF AN AUCTION, (C) FIXING THE MANNER AND EXTENT OF NOTICE, (D) APPROVING THE SALE OF THE DEBTOR'S ASSETS TO THE PARTY OR PARTIES SUBMITTING THE HIGHEST OR BEST BID(S) AT THE AUCTION, AND (E) GRANTING RELATED RELIEF

SpectraWatt, Inc., the above-captioned debtor-in-possession (the "Debtor"), files this motion ("Motion"), pursuant to sections 105, 363 and 365 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*, the "Bankruptcy Code") and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking entry of (i) following an initial, emergency hearing (the "Bidding Procedures Hearing"), an order (the "Bidding Procedures Order") (a) authorizing and scheduling an Auction (as defined below) at which the

Sales Agent (as defined below), on behalf of and in concert with the Debtor, will solicit the highest or best bid or bids for the sale of substantially all of the Debtor's assets (the "Assets"), (b) approving the sale and bidding process described below to be used in connection with the conduct of the Auction and the proposed sale of the Assets, (c) fixing the manner and extent of notice, and (e) granting related relief; and (ii) following a final hearing (the "Sale Hearing"), an order (the "Sale Order") (a) approving the sale by the Debtor of the Assets to the party or parties submitting the highest or best bids for such Assets in connection with the sale and bidding process, (b) approving the assumption and assignment of any executory contracts and unexpired leases that are included in any successful bids resulting from the sale and bidding process, and (c) granting related relief. In support of this Motion, the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

## BACKROUND

2. On August 19, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is authorized to operate its businesses and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. The Debtor is a developer and manufacturer of advanced crystalline silicon cells used in the generation of solar electricity (the "Business"). The Debtor was formed in June 2008 with certain intellectual property and other assets acquired from Intel Corporation, together with

a $50 million capital contribution from certain investors.  Since that time, the Debtor has developed, manufactured and distributed silicon solar cells for use in solar modules.  The Debtor has also engaged in substantial research and development in the solar cell field.  The Debtor's goal was to improve upon current solar cell technology and enable solar-generated electricity to compete, on an unsubsidized basis, with conventional sources of electricity.

4.     In 2009, the Debtor relocated its corporate headquarters from Hillsboro, Oregon to Hopewell Junction, New York to take advantage of incentives provided by the New York State Energy Research and Development Authority and to access the region's large skilled workforce.  The Debtor leases facilities at IBM's Hudson Valley Research Park, 2070 Route 52, Bldg 334 Zip 23A, Hopewell Junction, New York 12533 (the "New York Facility"), where the Debtor constructed a state-of-the-art manufacturing facility seeking full-scale production capacity of over two hundred (200) megawatts of production per year.[1]  The Debtor began operating the New York Facility in January 2010 at an initial capacity of thirty (30) megawatts per year.

5.     Due to defects in vendor-supplied silicon wafers that were a key component of its products and certain defects in production equipment, the Debtor faced delays and the quality of the Debtor's finished products failed to meet purchaser specifications.[2]  As a result, the Debtor was forced to sell a large quantity of its finished products at reduced prices and, accordingly, the Debtor suffered from lost revenues.  The Debtor's inability to produce finished products at the required specifications also led to customer defections.  Ultimately, the Debtor was able to

---

[1] Production of solar cells is measured in megawatts per year.  Two hundred (200) megawatts per year is equivalent to approximately fifty million (50,000,000) wafers.

[2] These defects will likely be the subject of future litigation or potential settlements of disputes the Debtor has with certain of its key suppliers and service providers.

resolve some of these problems and/or replace certain of its suppliers, but the financial difficulties caused by these problems contributed to the Debtor's inability to obtain additional financing in late 2010 (which would have allowed the Debtor to continue production), or to obtain a strategic equity partner.

6. The defects in the Debtor's production equipment and silicon wafers severely impacted the Debtor's business at the crucial early stages of production when the Debtor could ill-afford such major setbacks. The Debtor, given the production issues caused by these problems and without access to additional financing, announced in late December 2010 that it would close its manufacturing facilities. By the end of March 2011, the Debtor had completed the shut-down of its manufacturing facilities and laid-off all of its workforce in New York and Oregon. The Debtor subsequently closed its remaining Oregon operations and has liquidated its physical assets in Oregon. Following the termination of its employees, the Debtor rehired six (6) of its previous employees, giving them additional responsibilities.[3] Although the Debtor has ceased its manufacturing activities, the Debtor continued over the last several months to fill orders for its completed product inventory, leaving virtually no remaining finished goods inventory as of the Petition Date.

**BASIS FOR RELIEF**

7. Due to the challenges facing the Debtor, prior to the filing of the bankruptcy case, the Debtor began scrutinizing carefully the Business and exploring strategic alternatives. After evaluating its strategic alternatives, the Debtor concluded that it was not economically feasible to restart its development and manufacturing operations and decided that its best alternative was to market the Business for sale as a going-concern. The Debtor further concluded that a sale of the Business as a going-concern would permit the Debtor to monetize the Assets for distribution to

---

[3] As of the Petition Date, the Debtor has five (5) employees.

creditors at the maximum attainable value and would permit the Business to be owned and operated by a new owner that was better capitalized than the Debtor — a result that would yield significant benefits to the Debtor's creditors, employees, vendors, suppliers, customers and other stakeholders.

8.     In connection with its decision to pursue additional financing, on or around April 2010, the Debtor retained Needham & Co. ("Needham") as its investment banker to assist the Debtor in obtaining a third round of financing.  Those efforts were not successful.  Ultimately, the Debtor decided to instead seek a strategic buyer for the Business.  Needham assisted with these efforts from late 2010 through March 2011, attempting to identify parties to acquire the Business as an operating, going concern.  The Debtor and Needham tried to identify and contact all third party purchasers that might be interested in pursuing such a going-concern sale transaction.  In connection with this sale process, approximately fifty-two (52) parties were contacted by Needham regarding a transaction and approximately ten (10) potential purchasers submitted indications of interest to the Debtor, and the Debtor reviewed the terms and conditions of six definitive proposals submitted by interested parties.

9.     By late March 2011, the Debtor determined Needham had failed to identify significant candidates for a strategic sale and asked Needham to assist the Debtor's management team in their effort to seek interested buyers.  The Debtor, through contacts made directly by potential buyers to the company and connections indentified by vendors, significant suppliers and other parties-in-interest, made contact with a new group of interested buyers, at this stage largely foreign parties.  The Debtor requested a number of interested parties to submit formal proposals which occurred throughout the period during April through June 2011.  A number of preliminary proposals were made to the Debtor directly by potential buyers.  The Debtor

evaluated the terms and conditions of these proposals (including the consideration offered) and evaluated the financial capabilities of the submitting parties to identify the strongest offers. The Debtor's management entered into negotiations with several potential strategic buyers in an effort to obtain a signed, detailed term sheet proposal that could serve as the basis for a stalking horse transaction in an auction process. A number of these parties performed significant due diligence at the Debtor's facility in New York, and the Debtor provided extensive due diligence materials to these potential buyers over the course of several months. Needham's role assisting Debtor's management was terminated late May 2011.

10.     Following the submission of more detailed bids, the Debtor had advanced discussions with a number of interested parties regarding the terms and conditions pursuant to which such interested parties would be willing to pursue a going-concern acquisition of substantially all of the Assets. Given the nature of the Business and the current state of the solar cell manufacturing market, the interested parties which (recently) showed serious interest in acquiring the Assets have been companies based outside of the United States. Following their discussions with these foreign companies, the Debtor and its legal advisor determined that most of the potential foreign buyers are either reluctant or unwilling to serve as a stalking horse purchaser in the Debtor's bankruptcy case due to their unfamiliarity, or lack of comfort, with the typical stalking horse process used in Section 363 sales in the United States. In fact, the Debtor was not able to proceed to a formal term sheet with any potential stalking horse buyer, despite substantial interest by a number of parties. Yet, those same interested companies have indicated that they may be willing to participate in a bankruptcy auction of the Assets (provided they do not have to serve as a "stalking horse" in a typical bankruptcy process), so long as they are

comfortable that the Assets will be sold to the party or parties submitting the highest bid or bids at such auction.

11.     The Debtor believes it is crucial to proceed with a sale process now due to the serious financial distress that has been experienced by other solar cell manufacturers.  The Debtor believes that, within the next 3-6 months, there is a high likelihood that a significant amount of used solar cell manufacturing equipment and related assets (i.e., assets substantially similar to the Debtor's Assets) will flood the market and drive down the value of the Debtor's Assets.  Additionally, maintaining the Debtor's operations, including the retention of remaining key employees, a large underutilized facility, and substantial other costs (the so-called "burn rate" of the Debtor), would ultimately deplete the remaining financial resources of the Debtor and yield little or no resulting return to creditors.

12.     Accordingly, due to the reluctance of foreign buyers to serve as a baseline bidder for the Assets, the Debtor's concern that the market for solar cell manufacturing equipment will decline significantly in the near future, and the Debtor's significant ongoing operational costs, the Debtor has concluded that it should start the bankruptcy sale process now (rather than waiting for a stalking horse purchaser to sign a definitive agreement).  After considering its alternatives, the Debtor has determined that the most prudent course of action under the circumstances (and the course of action that will result in the highest purchase price for the Assets) is to establish and announce a hard date for conducting an auction.  At this Auction, the Debtor will offer the Assets in a variety of lots including, without limitation, a "going-concern" lot which will include substantially all of the Assets of the Debtor, as well as numerous "piecemeal" lots which will include most of the Debtor's tangible Assets on an item by item basis.

13.     Based on its discussions with parties that have expressed interest in the Assets, as well as discussions with its professionals, the Debtor believes that conducting the Auction in accordance with the Bidding Procedures (as defined below) will maximize the Debtor's potential for receiving a going-concern bid for substantially all of the Assets (either before or at the Auction).  In fact, after the Debtor and its advisors begin the marketing process leading up to the Auction, one or more parties may offer to serve as the stalking horse bidder for substantially all of the Assets.  Accordingly, the Debtor reserves its right, if any potential buyer submits very significant interest at a substantial purchase price, to return to this Court seeking, among other things, the approval of a stalking horse purchaser for the Assets, material modifications to the Bidding Procedures, and additional related relief.

14.     On July 25, 2011, the Debtor, on the one hand, and Heritage Global Partners Inc., Counsel RB Capital, LLC and Silicon Valley Disposition Inc. (collectively, the "Sales Agent"), on the other hand, entered into that certain Exclusive Sales Agent Agreement (a copy of which is attached hereto as Exhibit A, the "Agency Agreement"), pursuant to which the Sales Agent agreed to conduct an offering and sale process for the Assets, on behalf of and in concert with the Debtor, in accordance with the terms and conditions set forth in the Agency Agreement. Contemporaneously with the filing of this Motion, the Debtor has filed pleadings with this Court seeking the employment of the Sales Agent and the approval of the Agency Agreement.

15.     The Sales Agent has extensive experience marketing and conducting auctions for manufacturing equipment and other assets similar to the Assets being sold by the Debtor.  In order to maximize the value received by the Debtor's estate from the sale of the Assets, the Debtor and the Sales Agent have developed the following proposed process for continuing to market the Assets for sale (the "Proposed Sale Process").  In connection therewith, the Debtor

requests that this Court approve the Proposed Sale Process, including the following auction and

bidding procedures (the "Bidding Procedures"):

(i)    Assets to Be Sold. The Sales Agent would be offering for sale substantially all of the tangible and intangible property of the Debtor (i.e., the Assets), other than the Excluded Assets (as defined below), in the lots or groups of lots set forth below in order to achieve the highest or otherwise best collective value for the Assets. The description of the lots are as follows:

(a)    Lot 1: Bulk "Going Concern" Bid. Lot 1 shall consist of all tangible and intangible Assets of the Debtor's estate (other than the Excluded Assets), including, without limitation, (1) all Assets set forth in the Due Diligence Package (as defined below), (2) all machinery, equipment (including office equipment, computers, and office supplies), supplies of wet chemicals and aluminum paste, furniture, furnishings, fixtures and other items of tangible personal property located at the New York Facility, (3) all vehicles and lifting devices located at the New York Facility, (4) all licenses, permits, approvals, certificates of occupancy, authorizations, operating permits, registrations, plans and the like, in each case, to the extent transferable without the consent of any governmental body, entity, division or authority, (5) all data and records relating to the Business or the Assets, including client and customer lists and records, referral sources, equipment logs, operating guides and manuals, creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents and records (all in the state in which such records and information currently exist); provided, however, that the Debtor shall be entitled to retain copies of such books, records, files and papers, and (6) all rights of the Debtor under any of the Debtor's executory contracts or leases, but only to the extent that a successful bidder designates an executory contract or lease for assumption and agrees to pay the Cure Costs (as defined below) associated with such executory contract or lease as part of its bid.

(b)    Lot 2: Bulk Tangible Property Bid. Lot 2 shall consist of all tangible Assets of the Debtor's estate (other than the Excluded Assets), including, without limitation, (1) all tangible Assets set forth in the Due Diligence Package (as defined below), (2) all machinery, equipment (including office equipment, computers, and office supplies), supplies of wet chemicals and aluminum paste, furniture, furnishings, fixtures and other items of tangible personal property located at the New York Facility, and (3) all vehicles and lifting devices located at the New York Facility.

(c)    Lots 3 through 551: Individual Items. Lots 3 through 551 shall consist of "piecemeal" lots that include substantially all of the Debtor's tangible Assets on an item by item basis. A description of the items listed for sale

in these Lots is set forth in the Due Diligence Package, as well as on the Sales Agent's website (www.hgpauction.com).

(d) <u>Combinations</u>. Any combinations of Lots 3 through 551 may be designated by a bidder; <u>provided</u>, <u>however</u>, that combination offers will only be permitted with the consent of the Debtor and Sales Agent.

(ii) <u>Excluded Assets</u>. Notwithstanding anything herein to the contrary, the Debtor shall retain, and Sales Agent shall not sell, convey, transfer, assign or solicit bids for, the following Assets of the Debtor (collectively, the "<u>Excluded Assets</u>"): (a) all cash and cash equivalents on hand (including, without limitation, all undeposited checks) and in banks or other financial institutions, (b) except as described above, all inventory (including, without limitation, raw materials, work in process and finished goods), (c) all accounts, accounts receivable, notes and others receivables (including all claims or actions against third parties related to the collectability thereof), (d) all utility deposits, security deposits, deposits held by parties to the executory contracts and unexpired leases (whether such contract or lease is assigned to a bidder or otherwise) and other deposits of any kind or nature whatsoever, (e) all avoidance claims or other claims or causes of action of the Debtor, whether arising under the Bankruptcy Code, applicable state law or otherwise, and the proceeds thereof, including, without limitation, actions available to the Debtor under chapter 5 of the Bankruptcy Code, of whatever kind or nature, and whether asserted or unasserted, (f) all tangible property not located at the New York Facility as of the date of the Auction, (g) the minute books and organizational documents of the Debtor, all of the Debtor's financial and accounting records, and all tax records, (h) all tax refunds, credits and benefits and all net operating losses of the Debtor, and (j) all intellectual property including, without limitation, all patents, patent applications, patent rights, trademarks (registered and at common law), trademark registrations and applications, trade names, logos, trade dress, brand names, service marks (registered and at common law), service mark registrations and applications, domain names and other indicia of source, works of authorship, copyrights, copyright registrations and applications for registration, moral rights, know-how, trade secrets, customer lists, proprietary information, proprietary processes and formulae, databases and data collections, source and object codes, software, algorithms, architecture, structure, display screens, layouts, inventions, development tools, and all documentation and media. Notwithstanding the foregoing, the Debtor reserves the right to permit a Qualified Bidder to include any Excluded Asset in a bid for Lot 1, <u>provided</u> that the Debtor is satisfied with the purchase price and other related terms of sale set forth in such bid, and <u>provided</u> <u>further</u> that, in the event that the Debtor permits a Qualified Bidder to include an Excluded Asset in its bid for Lot 1, all other Qualified Bidders shall be permitted to include such Excluded Asset in their respective higher or better bids on Lot 1.

(iii)    <u>Due Diligence Package and Inspection</u>.  Each person interested in bidding on the Assets and/or participating in the Auction may request a due diligence package (the "<u>Due Diligence Package</u>").  The Due Diligence Package contains, among other things, a description of the Assets to be offered for sale at the Auction.  All requests should be made to:  Mark Castaldo, Senior Vice President Sales, Telephone:  (203)  499-8309;  Toll  free:  (877)  243-7411; mcastaldo@svdisposition.com.  Inspections of the Assets can also be scheduled by contacting Mark Castaldo, contact information provided above.  Additional information regarding the Assets, the Auction and the sale process are available on the Sales Agent's website (www.hgpauction.com).

(iv)    <u>Qualification to Bid at the Auction</u>.  Any person interested in bidding on the Assets being offered for sale at the Auction must deliver the following to the Sales Agent at or prior to the Auction:

(a)    Parties interested in submitting bids for Lots 1 and 2 must provide a good faith deposit equal to two hundred fifty thousand dollars ($250,000).  The deposit must be in the form of a certified check made out to the Sales Agent or by wire transfer to an account designated by the Sales Agent.

(b)    Following the conclusion of the Auction, each successful bidder for Lots 3 through 551 (or any combination thereof) must provide a deposit equal to no less than twenty five percent (25%) of the amount of such bidder's successful bid (excluding any buyer's premium).  The deposit must be in the form of a certified check made out to the Sales Agent, via wire transfer to an account designated by the Sales Agent or otherwise submitted through the Sales Agent's website via credit card, debit card, bank transfer or other available method set forth on the Sales Agent's website.

(c)    Bids for Lots 1 and 2 must include evidence satisfactory to the Sales Agent and the Debtor in their commercially reasonable discretion, prior to any bid at the Auction, that the party making such bid is willing, authorized, capable and qualified financially, legally and otherwise, of closing a purchase of the Lot 1 or Lot 2 Assets (as applicable) in cash in the event that it submits a Prevailing Bid (as hereinafter defined) at the Auction.

(d)    Bids for Lot 1 must contain a signed definitive asset purchase agreement in the form attached hereto as <u>Exhibit B</u> (the "<u>Form Purchase Agreement</u>"), together with a copy of the signed agreement that is marked to show changes from the Form Purchase Agreement.  At a minimum, such asset purchase agreement must (1) clearly set forth the purchase price to be paid, (2) include a list of all executory contracts and leases that are to be assumed and assigned to bidder as part of the purchase, (3) provide that the bidder shall be responsible for paying all Cure Costs necessary to cure such executory contracts and leases and shall be responsible for providing

evidence at the Sale Hearing necessary to demonstrate adequate assurance of future performance under such executory contracts and leases, (4) have substantially similar terms and conditions as the Form Purchase Agreement, (5) contain terms and conditions no less favorable to the Debtor's estate than the terms and conditions in the Form Purchase Agreement, (6) not be subject to any financing contingency, contingency relating to the completion of unperformed due diligence, contingency relating to the approval of the bidder's board of directors or other internal approvals or consents, or conditions precedent to the overbidder's obligation to purchase the Assets other than those included in the Form Purchase Agreement, (7) provide for a closing date of not later than the Closing Deadline (as defined below), and (8) not provide for the payment to the bidder of any breakup fee, topping fee, expense reimbursement or other similar arrangement.

None of the bids may contain any financing, due diligence or "material adverse change" contingencies and the bid of any Prevailing Bidder will be binding whether or not (a) the Prevailing Bidder has obtained financing or completed its due diligence investigation, or (b) a "material adverse change" has occurred. Any party satisfying the conditions of this section of the Bidding Procedures shall be permitted to participate in the Auction and shall be considered a "Qualified Bidder" as such term is used herein.

(v) <u>Pre-Auction Bidding</u>. All bidding for the Assets will occur at the Auction. Notwithstanding the foregoing, a Qualified Bidder shall be permitted to submit a bid to the Sales Agent prior to the Auction and designate the Sales Agent as its proxy to make such bid on its behalf at the Auction.

(vi) <u>Terms of Sale</u>. The Assets are being sold, (i) **"AS IS, WHERE IS, AND WITH ALL FAULTS,"** and the Debtor expressly disclaims all warranties, including (but not limited to) warranties of merchantability and fitness for a particular purpose or use, and (ii) **"THERE IS NO WARRANTY RELATING TO QUIET ENJOYMENT, OR THE LIKE IN THE DISPOSITION OF ANY OF THE ASSETS."** Bidders are advised, and by submitting a bid each bidder is deemed to acknowledge, that the Sales Agent, the Debtor and each of their respective directors, officers, managers, employees, agents, advisors and attorneys have no knowledge with respect to, and have no obligation to investigate, the merchantability or fitness for any particular purpose or use of any of the Assets. **NO WARRANTY OR REPAIR PROGRAM FOR THE ASSETS IS BEING OFFERED AS PART OF THE SALE.** Notwithstanding the foregoing, in the event a bid for Lot 1 equals or exceeds $9.25 million, a limited warranty may be provided subject to the specific terms and conditions as set forth in an agreement with the Debtor's primary equipment supplier.

(vii) <u>Auction</u>. The Debtor requests that the Sales Agent shall conduct a live public auction sale of the Assets at **10:00 a.m. (local time in Hopewell Junction, New**

**York) on September 28, 2011** at the New York Facility (the "<u>Auction</u>").  At all times, the Auction will be conducted on site at the New York Facility and over the internet using webcast technology through the Sales Agent's website.  Prior to receiving bids for the Assets at the Auction, the Sales Agent will read the Bidding Procedures for the benefit of those in attendance and announce any additional terms of sale not otherwise set forth in the Bidding Procedures.

At the Auction, the Sales Agent will begin by soliciting bids for the Assets included in Lot 1.  Qualified Bidders may submit successive bids for Lot 1 in increments of at least $100,000 greater than the prior bid until there is only one offer that the Sales Agent (in consultation with the Debtor) determines to be the highest bid for Lot 1.  Upon determining the highest bid for Lot 1 (if any), the Sales Agent will announce such bid as the final bid for Lot 1 and no additional bids on Lot 1 shall be solicited or received by the Sales Agent at or after the Auction.

After closing the bidding on Lot 1, the Sales Agent will solicit bids for the Assets included in Lot 2.  Qualified Bidders may submit successive bids for Lot 2 in increments of at least $100,000 greater than the prior bid until there is only one offer that the Sales Agent (in consultation with the Debtor) determines to be the highest bid for Lot 2.  Upon determining the highest bid for Lot 2 (if any), the Sales Agent will announce such bid as the final bid for Lot 2 and no additional bids on Lot 2 shall be solicited or received by the Sales Agent at or after the Auction.

After closing the bidding on Lot 2, the Sales Agent will solicit bids for each of Lots 3 through 551.  Qualified Bidders may submit successive bids for these lots in such bidding increments announced by the Sales Agent prior to each round of bidding on such lots, as determined by the Sales Agent in consultation with the Debtor, until there is only one offer with respect to each lot that the Sales Agent (in consultation with the Debtor) determines to be the highest bid for such lot.  If, at any time during the Auction, the Sales Agent determines that the solicitation of bids on Lots 3 through 551 is unlikely to produce an aggregate offer that is higher or better than the bids received for Lots 1 or 2 (as applicable), the Sales Agent (upon receiving the consent of the Debtor) may cancel the Auction and certify the winning bid(s) and backup bid(s).

In conducting the Auction, the Sales Agent (in consultation with the Debtor) may set reserve prices and/or minimum starting bids with respect to any lot or combination of lots offered for sale at the Auction.

(viii)  <u>Prevailing Bid(s); Backup Bid(s)</u>.  Upon the conclusion of the Auction, the Sales Agent and the Debtor shall (a) identify and certify the bid or bids that constitute the highest or best offer or offers for the Assets (each bid a "<u>Prevailing Bid</u>" and each person submitting such bid a "<u>Prevailing Bidder</u>"), and (b) identify and certify the bid or bids that constitute the next highest or best offer or offers for the

Assets (each bid a "Backup Bid" and each person submitting such bid a "Backup Bidder"), and, in each case, notify the Prevailing Bidder(s) and Backup Bidder(s). In determining the Prevailing Bid(s) and the Backup Bid(s), the Sales Agent and the Debtor will consider, among other things: (a) the number, type and nature of any changes to the Form Purchase Agreement requested by each bidder for Lot 1, (b) the extent to which such modifications are likely to delay closing of the sale of the Assets and the cost to the Debtor of such modifications or delay, (c) the total consideration to be received by the Debtor, (d) the likelihood of the bidder's ability to close a transaction and the timing thereof, and (e) the net benefit to the Debtor's estate. After the Auction has concluded, the Debtor shall present to the Court for consideration and approval at the Sale Hearing the Prevailing Bid(s) and the Backup Bid(s). All bidding for the Assets will be concluded at the Auction and there will be no further bidding at the Sale Hearing.

(ix)     Auction Report. Immediately following the Auction and, in any event, prior to the commencement of the Sale Hearing, the Debtor shall file a notice on the docket in the bankruptcy case setting forth the results of the Auction (the "Auction Report"). The Auction Report shall, among other things, (a) identify the Prevailing Bidder(s) and the Backup Bidder(s), (b) identify the Assets to be purchased by the Prevailing Bidder(s), (c) set forth the purchase price to be paid by the Prevailing Bidder(s) for such Assets, and (d) identify any of the Debtor's executory contracts and leases to be assumed by the Prevailing Bidder(s) (the "Assigned Contracts").

(x)      Buyer's Premium; Expense Reimbursement. The Sales Agent will not receive any commission or fee for the services provided by the Sales Agent. However, the Sales Agent will charge each Prevailing Bidder a buyer's premium of fifteen percent (15%) of the gross sale proceeds to be paid by such Prevailing Bidder pursuant to its Prevailing Bid(s) (the "Buyer's Premium") and such Prevailing Bidder shall be required to pay the Buyer's Premium at or prior to the closing of the sale. The Debtor's estate is not responsible for any unpaid portion of the Buyer's Premium. Pursuant to the Agency Agreement, the Debtor and the Sales Agent have agreed to split the Buyer's Premium as follows:

| Total Gross Sale Proceeds | Allocation of Buyer's Premium |
| --- | --- |
| $0 - $5,000,000 | 100% of 15% Buyer's Premium to Sales Agent |
| $5,000,001 - $8,000,000 | 12.5% to Sales Agent; 2.5% to the Debtor |
| $8,000,001 and up | 11.5% to Sales Agent; 3.5% to the Debtor |

In addition to the Buyer's Premium, the Sales Agent shall be permitted to deduct from the gross proceeds an amount equal to the expenses actually incurred by the Sales Agent in connection with the Auction and the Proposed Sale Process (such as labor, advertising, travel and lodging), provided that such amount shall not exceed $50,000.

(xi)     Sale Hearing.  The Sale Hearing is requested to occur at 10:00 a.m. on September 30, 2011 at the United States Bankruptcy Court, 355 Main Street, Poughkeepsie, NY 12601, at which time the Debtor intends to present the Prevailing Bid(s) for approval by the Court pursuant to the provisions of sections 105, 363(b), 363(f), 363(m), 363(n) and 365 of the Bankruptcy Code; provided, however, that, if the Prevailing Bid(s) contemplate the assumption and assignment of any Assigned Contracts, the Debtor requests the Sale Hearing to be conducted at 10:00 a.m. on October 5, 2011 at the United States Bankruptcy Court, 355 Main Street, Poughkeepsie, NY 12601, so that the Debtor may provide appropriate notice of the proposed cure costs to be paid in connection with the assumption and assignment of such Assigned Contracts to the nondebtor parties to the Assigned Contracts.  At the Sale Hearing, the Debtor shall report the results of the Auction and the Debtor's recommendation with respect to the Prevailing Bid(s) and Backup Bid(s), which is subject to approval of this Court.  The Debtor shall be deemed to have accepted a bid only when the bid has been approved by the Court at the Sale Hearing.

(xii)    Closing Deadline; Asset Removal Deadline.  The sale(s) contemplated by the Prevailing Bid(s) shall be closed within three (3) business days after the Court enters the Sale Order or by such other deadline agreed to between the Debtor and the Prevailing Bidder(s) (the "Closing Deadline").  At the closing of the sale of any Asset, the purchaser shall (a) pay the Sales Agent with a certified check, bank check or wire transfer for the full outstanding cash balance of the purchase price (including, without limitation, any cure amounts related to any Assigned Contracts), and (b) pay the Sales Agent with a certified check, bank check or wire transfer in favor of the Sales Agent for any Buyer's Premium due to the Sales Agent in accordance with these Bidding Procedures and the Court's order approving the Sales Agent's engagement by the Debtor.  Each Prevailing Bidder's or Backup Bidder's sole remedy in the event that a sale fails to close as a result of the Debtor's refusal or inability to close shall be a refund of the monies deposited by such bidder.

Any Prevailing Bidder that is purchasing any of the Debtor's personal property Assets on a non-going-concern basis shall be required to remove such Assets from the New York Facility immediately and, in any event, by no later than thirty (30) days after the Auction or by such other deadline agreed to between the Debtor and such Prevailing Bidder.  Each Prevailing Bidder shall be solely responsible for any and all fees, costs and expenses associated with any purchased Assets on and immediately after the Closing Deadline, including, without limitation, any costs and expenses attributable to rent and related expenses for the period of time following the Closing Deadline (regardless of when payment of such rent or related expenses is due pursuant to the applicable lease) and any fees and expenses of the Debtor incurred in connection with such Asset following the Closing Deadline.

(xiii)  <u>Customs and Taxes</u>.  Purchasers of the Assets shall be solely responsible for paying any customs duties and taxes due and owing on any of the Assets including, without limitation, any sales taxes, stamp taxes, recording taxes or transfer taxes.

(xiv)  <u>Liquidated Damages; Backup Bid(s)</u>.  The Debtor will retain as liquidated damages the good faith deposit of any Prevailing Bidder which fails to close the transaction contemplated in its Prevailing Bid on or before the Closing Deadline. In that event, the Backup Bid or Bids, as identified at the Sale Hearing, shall be deemed to be the Prevailing Bidder(s) and the Sales Agent shall be authorized to effectuate such sale(s) contemplated by the Backup Bid(s).  A Backup Bidder may be required by the Debtor to close on its Backup Bid within ten (10) days of the conclusion of the Auction.  The failure of a Backup Bidder to close on the transaction contemplated in its Backup Bid as if it were the Prevailing Bid shall subject it to forfeiture of its good faith deposit and the retention of such deposit by the Debtor.

(xv)  <u>Return of Good Faith Deposit</u>.  Good faith deposits of all Qualified Bidders, other than the Prevailing Bidder(s) and the Backup Bidder(s), shall be returned to such Qualified Bidders within five (5) business days following the conclusion of the Auction.  The good faith deposit of the Backup Bidder(s) shall be returned to such Backup Bidder within five (5) business days following the closing of the transactions contemplated in the Prevailing Bid(s).

(xvi)  <u>Modifications</u>.  The Sales Agent may determine, in its business judgment, but only following the receipt of the Debtor's consent, which bid or bids, if any, constitute the highest or otherwise best offer(s) for the Assets, and may reject at any time any bid that, in the Sales Agent's discretion, but subject to the Debtor's consent, is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bidding Procedures or the terms and conditions of sale, or (c) contrary to the best interests of the Debtor.  At any time before or at the Auction, and subject to the consent of the Debtor, the Sales Agent (y) may impose such other bidding procedures and terms and conditions as it may determine are in the best interests of the Debtor and other parties in interest, and (z) may modify or amend these Bidding Procedures.

16.  The Debtor believes that the Proposed Sale Process offers the best opportunity for the Debtor to maximize the value of the Business and the Assets for the benefit of its estate following significant marketing efforts and, therefore, the Debtor believes that implementation of the Proposed Sale Process is in the best interests of its estate and should be approved.

17. The Debtor's secured lenders (the "Series A-1 Noteholders") have agreed to allow the sale of the Purchased Assets upon the Agreement of the Debtor to pay to the Agent for the Series A-1 Noteholders the proceeds of the sale of the Purchased Assets, less the following costs, expenses and holdbacks: i) all cash necessary to pay any commissions due to the Sales Agent not otherwise paid by the Purchaser(s); ii) all cash necessary to satisfy any negative amount in the budget approved by the Court in the last cash collateral order; iii) all cash necessary to pay priority claims in the case; iv) all cash necessary, based upon agreement of the Debtor and the Agent for the A-1 Noteholders (but in no event less than $50,000), to fund a wind-down trust; and v) all cash necessary to fund a pari passu distribution to general unsecured trade creditors equivalent to that of the A-1 Noteholders under a plan of reorganization (collectively, the "Net Sale Proceeds").

## RELIEF REQUESTED

18. By this Motion, the Debtor requests that the Court grant the following relief:

(a) Following the Bidding Procedures Hearing, enter an order (i) approving the Proposed Sale Process and the Bidding Procedures, including the procedures for submitting bids, conducting the Auction, and identifying the Prevailing Bid(s) and Backup Bid(s), and (ii) fixing the manner and extent of notice.

(b) Following the Sale Hearing, enter the Sale Order approving the sale of the Assets to the Prevailing Bidder(s) and making the following findings and determinations, among others, with respect to such sale:

(i) the Prevailing Bidder(s) shall have and acquire at the closing good, valid and marketable title to the Assets and the Assets shall be sold and conveyed to the Prevailing Bidders free and clear of any and all liens, Claims (as such term in defined in the Bankruptcy Code) and encumbrances;

(ii) the Debtor shall assume and assign (as of the closing date) to the Prevailing Bidder(s), all of the executory contracts and leases designated by the Prevailing Bidder(s) as Assigned Contracts;

(iii)    the amounts that must be paid to the nondebtor parties to the Assigned Contracts in connection with any assumption and assignment of such Assigned Contracts shall be fixed at the amounts identified by notice made by Debtor at least five (5) days prior to the Sale Hearing or at such other amounts determined by the Court (the "Cure Costs");

(iv)    the Prevailing Bidder(s) shall, on or before the closing date, pay the Cure Costs to the appropriate parties as ordered by the Court so as to permit the assumption and assignment of all Assigned Contracts;

(v)    the Assigned Contracts shall be in full force and effect from and after the closing with non-debtor parties being barred and enjoined from asserting against the Prevailing Bidder(s), among other things, defaults, breaches or claims of pecuniary losses existing as of the closing or by reason of the closing;

(vi)    the results of the Auction are approved;

(vii)    the Prevailing Bidder(s) shall be found to be "good faith" purchaser(s) within the meaning of section 363(m) of the Bankruptcy Code; and

(viii)    the Court shall waive any stay that would otherwise be applicable to the immediate effectiveness of the Sale Order pursuant to Bankruptcy Rules 6004(g) and 6006(d).

## ARGUMENT

19.    As stated above, the Debtor believes that the Proposed Sale Process provides the Debtor with its best opportunity to preserve and maximize the value of the Business and the Assets for the benefit of its estate and, therefore, the Debtor believes that implementation of the Proposed Sale Process, and approval of any sale that is presented in accordance therewith, is in the best interests of the Debtor's creditors, employees, estate and other stakeholders. As such, the Debtor submits that approval of this Motion and the Proposed Sale Process is consistent with applicable law and should be granted.

**A.    The Proposed Sale Process and Bidding Procedures are Reasonable and Should be Approved**

20.    In order to further the goal of maximizing sale proceeds and returns to the estate, courts typically approve sale procedures that are intended to enhance competitive bidding. *See, e.g., In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates"); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) (bid procedures should allow for "an open and fair public sale designed to maximize value for the estate").

21.    The Debtor believes that the Proposed Sale Process and Bidding Procedures are justified and reasonable under the circumstances. As described above, the Assets have been fully marketed to all potential interested parties over an extended period of time. Moreover, for several months pre-petition, the Debtor's desire to sell its Assets or enter into some form of a strategic transaction with a suitable partner has been widely known in the industry. Any party wishing to express interest in the Debtor's Assets has had ample opportunity to do so.

22.    Despite the Debtor's diligent marketing efforts, it has (to date) been unsuccessful in its search for a going-concern purchaser of the Business. As mentioned above, most of the potential buyers for the Assets are foreign companies that are reluctant or unwilling to serve as a "stalking horse" purchaser for the Assets due to their lack of familiarity and comfort with the United States bankruptcy process. The Debtor believes, after consulting with its advisers, that it is preferable to start the sale process now rather than waiting for a committed stalking horse purchaser. The Debtor is concerned that, due to widespread financial distress in the solar cell manufacturing industry, the markets will soon be flooded with equipment and other assets similar to the Debtor's Assets, which will have the effect of significantly driving down the value

of the Assets. Accordingly, the Debtor believes that by providing foreign buyers a more certain and more familiar platform (i.e., an auction) for interested parties to bid on the Debtor's Assets, the Proposed Sale Process and Bidding Procedures will provide an appropriate framework for the Debtor to obtain the highest and best offers for the purchase of the Assets (including potential bids for a "going concern" acquisition of the Business) under the Debtor's less than ideal circumstances.

23.     Therefore, because the procedures set forth in the Proposed Sale Process, including the proposed Bidding Procedures, are fair and reasonable, and are reasonably calculated to produce the highest and best offers for the Assets under the circumstances, such procedures should be approved in this chapter 11 case.

**B.      The Court Should Approve the Sale of the Debtor's Assets Pursuant to Section 363(b) of the Bankruptcy Code**

   ***i.      Legal Standard***

24.     Section 363 of the Bankruptcy Code provides that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). It is well-established that subject to satisfying the applicable business judgment test, which is discussed below, a debtor may sell substantially all of its assets pursuant to section 363(b). *See Florida Dept. of Revenue v. Piccadilly Cafeteria, Inc.,* 128 S. Ct. 2326, 2331 n.2 (2008) (noting that chapter 11 "expressly contemplates [a debtor] . . . selling substantially all its assets" and distributing the proceeds pursuant to a plan of liquidation). There are numerous examples of cases where such sales were approved in order to preserve the value of a debtor's business. *See, e.g.*, *id.*

25.     Although section 363 does not articulate a standard for authorizing the sale or disposition of a debtor's assets, courts have approved such transactions using the business

judgment test.  *See In re Chrysler LLC*, 405 B.R. 84, 95-96 (Bankr. S.D.N.Y. 2009); *see Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997) ("A sale of a substantial part of a Chapter 11 estate other than in the ordinary course of business may be conducted if a good business reason exists to support it."); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Comm. Of Equity Security Holders v. Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Global Crossing Ltd.*, 295 B.R. 726, 742 (Bankr. S.D.N.Y. 2003); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 678-79 (Bankr. S.D.N.Y. 1989).

26.     As long as a valid business justification exists—as it does under the present circumstances—the decision to sell estate property is entitled to a strong presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company."  *In re Integrated Res., Inc.*, at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). This presumption results in courts giving substantial deference to the business decisions of debtors.  *See In re Global Crossing, Ltd.*, 295 B.R. 726, 744 n.58 (Bankr. S.D.N.Y. 2003) ("[T]he Court does not believe that it is appropriate for a bankruptcy court to substitute its own business judgment for that of the [d]ebtors and their advisors, so long as they have satisfied the requirements articulated in the caselaw.")

27.     As part of this analysis, courts may also consider (a) whether fair and reasonable consideration is provided, (b) whether the transaction has been proposed and negotiated in good faith, and (c) whether reasonable notice has been provided.  *See In re Condere*, 228 B.R. 615, 626 (Bankr. S.D. Miss. 1998); *see also In re Nicole Energy Servs., Inc.*, 385 B.R. 201, 210 (Bankr. S.D. Ohio 2008) (citations omitted); 3 COLLIER ON BANKRUPTCY ¶ 363.02[3] (15th ed. rev. 2009) ("It is now generally accepted that section 363 allows such sales [of substantial

portions of the debtor's assets] in chapter 11, as long as the sale proponent demonstrates a good, sound business justification for conducting the sale before confirmation (other than appeasement of the loudest creditor), that there has been adequate and reasonable notice of the sale, that the sale has been proposed in good faith, and that the purchase price is fair and reasonable.").

### ii.   *The Proposed Sale is Appropriate Under the Applicable Standard*

28.     The Debtor respectfully submits that a sale of the Assets to one or more Prevailing Bidders resulting from the Proposed Sale Process fits squarely within the parameters of the business judgment test and the factors enumerated above.  After months of marketing the Business for sale, the Debtor has determined that the Proposed Sale Process and related Auction represents the Debtor's last best chance to obtain the maximum value for its Assets under the circumstances.  Simply put, due to the present unwillingness of any interested party to serve as a stalking horse bidder for the Assets, the Auction provides the only available framework for all interested parties to attend (either in person or by webcast) and make competitive bids on the Assets — a framework which the Debtor believes could result in a lucrative going-concern bid for substantially all of the Assets.  However, regardless of the Prevailing Bid(s) received by the Debtor as a result of the Auction, the Debtor, its creditors and other parties in interest will have definitive proof by conducting the Auction that such Prevailing Bid or Bids represent the highest or best value attainable for the Assets at this time.

29.     In its business judgment, the Debtor believes that a sale of the Assets to one or more Prevailing Bidders maximizes the value of the Debtor's estate, which is the paramount goal of any proposed sale under section 363 of the Bankruptcy Code.  *See, e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate

at hand"); *Integrated Res.*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [debtor's] duty with respect to such sales is to obtain the highest price or greater overall benefit possible for the estate.").

30.     The consideration offered by one or more Prevailing Bidders will be reasonable under the circumstances, because it will represent the value attained by the Debtor after conducting a fulsome marketing and sale process over a number months with the assistance of numerous professionals with substantial experience in conducting sales of distressed assets.

31.     Furthermore, any proposed transaction between the Debtor and a Prevailing Bidder will have been the product of an open and competitive auction, will have been negotiated between the Prevailing Bidder and the Debtor at arms-length and in good faith, and the Debtor will testify at the Sale Hearing that there is no evidence of fraud or collusion between or among the Debtor, the Prevailing Bidder or any of the other bidders.  *See In re Abbotts Diaries of Pa., Inc.*, 788 F.2d 149-50 (3d Cir. 1986); *see also In re General Motors Corp.*, 407 B.R. at 494 (quotation marks omitted) (noting that "[g]ood faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings," including lack of fraud or collusion between the purchaser, other bidders and the debtor).  Finally, reasonable notice of the proposed sale has been provided under the circumstances of this case, as described in the "Notice" section below.

**C.     Sale of Assets Free and Clear of Encumbrances**

32.     The Debtor requests that the sale and transfer of the Assets pursuant to any Prevailing Bid be approved free and clear of all liens, claims, encumbrances and other interests, whether arising pre- or post-petition, other than those specifically assumed by such Prevailing Bidder, with any such interests attaching to the proceeds of the sale.  Such relief is consistent

with the provisions of section 363(f), which authorizes a debtor to sell assets free and clear of interests in property of an entity other than the estate if:

(i)        applicable nonbankruptcy law permits a sale of such property free and clear of such interest;

(ii)       such entity consents;

(iii)      such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(iv)      such interest is in *bona fide* dispute; or

(v)       such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

33.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five (5) requirements will suffice to permit the sale of the Assets "free and clear" of interests. *See, e.g., Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991); *In re Dundee Equity Corp.*, No. 89-B-10233, 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) ("[S]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."). The Court also may authorize the sale of a debtor's assets free and clear of any liens pursuant to section 105 of the Bankruptcy Code, even if section 363(f) of the Bankruptcy Code did not apply. *See In re Trans World Airlines. Inc.*, No. 01-0056, 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001) ("Bankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of § 363(f)."); *see also Volvo White Truck Corp. v. Chambersberg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

34.     The Debtor believes that at least one of the subsections of section 363(f) of the Bankruptcy Code is satisfied, because the Debtor expects the holders of liens on the Debtor's assets to consent to the proposed sale.  Moreover, as many courts have recognized, where an entity has not objected to a section 363 sale, consent may be implied for purposes of section 363(f)(2).  *See, e.g., FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285 (7th Cir. 2002) (in context of section 363(f), "lack of objection (provided of course there is notice) counts as consent"); *In re Enron Corp.*, No. 01-16034 (AJG), 2004 WL 5361245, at *2 (Bankr. S.D.N.Y. Feb. 5, 2004).  Accordingly, any party in interest who fails to object to the proposed sale should be deemed to have consented to the sale free and clear of any liens, claims, interests and encumbrances pursuant to section 363(f)(2) of the Bankruptcy Code.

35.     Further, holders of any liens or claims could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such liens and claims, satisfying section 363(f)(5).

**D.     Each Prevailing Bidder Should be Afforded All  Protections Under Section 363(m) as a Good Faith Purchaser and the Proposed Transactions Do Not Violate Section 363(n) Of The Bankruptcy Code**

36.     Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] ... does not affect the validity of a sale ... to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'"  *In re Chateaugay Corp.*, No. 92 CIV. 7054 (PKL), 1993 WL

159969, at *3 (S.D.N.Y. May 10, 1993) (quoting *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 at 147); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal."); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

37.     The selection of any purchaser for the disposition of the Debtor's Assets will be the product of arm's-length, good-faith negotiations in an anticipated competitive bidding process.  The Debtor intends to request at the Sale Hearing a finding that any Prevailing Bidder resulting from the Proposed Sale Process is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

38.     Section 363(n) of the Bankruptcy Code allows a trustee to avoid a section 363 sale where there has been collusion among bidders. As there is no suggestion that the Proposed Sale Process will be tainted by collusion, section 363(n) is (and will be) inapplicable.

**E.     Fixing the Cure Costs and Treatment of Executory Contracts and Unexpired Leases**

39.     In the event that the Prevailing Bid(s) contemplate the assumption and assignment of any Assigned Contracts, the Debtor will file a notice in this case at least five (5) days prior to the Sale Hearing (the "Cure Costs Notice") that sets forth the proposed Cure Costs due under such Assigned Contracts in connection with the requirement in section 365(b)(1) of the Bankruptcy Code that the debtor-in-possession, at the time of assumption, cure defaults in any executory contract or unexpired lease being assumed, or provide adequate assurance that the

default will be promptly cured. Immediately upon filing the Cure Costs Notice, the Debtor will serve such notice on the nondebtor parties to the Assigned Contracts by overnight mail.

40. The proposed Cure Costs set forth in the Cure Costs Notice shall be the Debtor's good faith determination of the exact cure amounts (after the Debtor's careful review of its books and records) that should be paid to the nondebtor parties to the Assigned Contracts in connection with the assumption and assignment of such Assigned Contracts. Accordingly, the Debtor requests that this Court include provisions in the Sale Order fixing the Cure Costs set forth in the Cure Costs Notice as the exact amounts needed to cure any defaults under the Assigned Contracts.

41. The Debtor seeks authority under Bankruptcy Code sections 105(a) and 365 to assume and assign the Assigned Contracts to one or more Prevailing Bidders. Accordingly, the Debtor also respectfully seeks provisions in the Sale Order (i) authorizing the Debtor to assume and assign the Assigned Contracts to the applicable Prevailing Bidders pursuant to section 365 of the Bankruptcy Code, (ii) authorizing and directing the applicable Prevailing Bidders to pay the Cure Costs at the closing, and (iii) deeming the non-debtor parties to the Assigned Contracts adequately assured of future performance.

42. Bankruptcy Code section 365 allows a debtor to maximize the value of the debtor's estate by assuming executory contracts or unexpired leases that benefit the estate and by rejecting those that do not. *See COR Route 5 Co., LLC v. The Penn Traffic Co. (In re The Penn Traffic Co.)*, 524 F.3d 373, 382 (2d Cir. 2008). A debtor in possession may assume an executory contract where assumption is a reasonable exercise of its business judgment. *See* 11 U.S.C. § 365(a); *In re Bradlees Stores, Inc.*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); *see also Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1312 (5th Cir. 1985). This

requirement is satisfied where a debtor in possession determines in good faith that assumption of an executory contract will benefit the estate. *See Orion Pictures Corp. v. Showtime Networks, Inc., (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (section 365 "permits the trustee or debtor-in-possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts of the debtor and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject"); *see also In re Gucci*, 193 B.R. 411, 414-15 (S.D.N.Y. 1996).

43.     Assumption and assignment of contracts is permitted, as long as the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. *See* 11 U.S.C. § 365(f)(2). The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" through "consideration of the facts of the proposed assumption." *In re Fleming Cos.*, 499 F.3d 300 (3d Cir. 2007) (*quoting Cinicola v. Scharfenberger*, 248 F.3d 110 at 120 n.10 (3d Cir. 2001)).[4] Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986).

44.     The Debtor will take all reasonable steps to ensure that any Prevailing Bidder has the financial ability, industry experience, and willingness to perform under any Assigned Contracts designated for assumption and assignment by such Prevailing Bidder. The Debtor will provide evidence to establish adequate assurance of future performance at the Sale Hearing.

**F.      Bankruptcy Rules 6004(h) and 6006(d) Should be Waived**

---

[4] Adequate assurance does not require an absolute guarantee of performance. *See, e.g., In re Westview 74th St. Drug Corp.*, 59 B.R. 747, 754 (Bankr. S.D.N.Y. 1986) ("The test is not one of guaranty but simply whether it appears that the [obligations] will be paid and . . . met").

45.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property … is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." FED. R. BANK. P. 6004(h).  Likewise, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease … is stayed until the expiration of 14 days after the entry of an order, unless the court orders otherwise." FED R. BANK. P. 6006(d).

46.     The Debtor requests that any order entered pursuant to this Motion authorizing the consummation of a transaction that is deemed a sale of assets and/or an assignment of an executory contract be effective immediately by providing that the 14-day stay under Rules 6004 or 6006, as the case may be, is inapplicable, so that the parties may proceed to close on the transaction as expeditiously as possible and within the time frames contemplated by this Motion. As described above, the Debtor believes that, absent a prompt sale, the Debtor could see the value of its Assets drop precipitously due to a flood of similar equipment and assets into the market.  Such a decrease in value of the Assets could motivate a Prevailing Bidder to "efficiently breach" its Prevailing Bid by abandoning its good faith deposit and pursuing other cheaper assets available in the market.  Therefore, it is imperative that the Sale Order be effective immediately to permit the proposed transaction(s) to close without any further delay by providing that the 14-day stay periods be waived.

**PROVISIONS THAT COULD BE CONSIDERED EXTRAORDINARY UNDER THE GUIDELINES ARE NECESSARY AND APPROPRIATE**

17044870

47.     This Motion seeks the following relief which may be considered Extraordinary Provisions under the Guidelines for the Conduct of Asset Sales (General Order M-331) (the "Guidelines"):[5]

    (a)     Relief from Bankruptcy Rule 6004(h).  For the reasons set forth herein, the Debtor requests relief from the 14 day stay imposed by Bankruptcy Rule 6004(h). Given the likelihood that the Debtor's assets would substantially diminish in value if the proposed transaction is not timely consummated, legitimate business reasons exist to justify this Court's approval of an order waiving the requirements of Bankruptcy Rule 6004(h).

## NOTICE

48.     Courts in this district have granted requests for emergency orders to establish procedures to sell assets of a debtor's estate on shortened notice at the commencement of the case.  *See In re Silicon Graphics, Inc*., No. 09-11701 (MG) (Bankr. S.D.N.Y. Apr. 3, 2009) (scheduling hearing to approve bidding procedures three business days after the petition date); *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sept. 17, 2008) (scheduling hearing to approve bidding procedures two business days after the petition date). Consistent with this authority, the Debtor intends to seek entry of the Bidding Procedures Order at an expedited emergency hearing scheduled to be conducted on August 25, 2011, at 10:00 a.m.

49.     Notice of this Motion is being given to: (a) the Office of the United States Trustee for this district and division, (b) the Series A-1 Noteholder Agent, (c) counsel for the Series A-1 Noteholder Agent, (d) the Debtor's unsecured creditors, (e) all other parties on the master service list proposed by the Debtor for this case, (f) counsel for any official or informal committees formed in this case, (g) any other entity who has requested notice under Bankruptcy Rule 2002, (h) all nondebtor parties to the Debtor's executory contracts and unexpired leases, (i) the Internal

---

[5] The following listing of possible "Extraordinary Provisions," as such term is defined in the Guidelines, is not intended to be an admission that any of these items are unusual in sales pursuant to section 363 of the Bankruptcy Code.

Revenue Service, (j) all parties known by the Debtor to assert a lien or security interest in the Assets, and (k) all parties who previously have expressed serious interest in acquiring all or substantially all of the Assets (collectively, the "Notice Parties"). In addition to the foregoing, the Debtor also proposes to give additional notice by mailing a copy of any Bidding Procedures Order entered by the Court within two (2) business days of the filing or entry thereof (as the case may be) to each of the Notice Parties. The Debtor submits that no other or further notice need be provided.

## NO PRIOR REQUEST

50.     No prior request for the relief sought in this Motion has been made to this or any other court in connection with this Chapter 11 case.

## CONCLUSION

WHEREFORE the Debtor requests entry of the orders annexed hereto as Exhibits C and D granting the relief requested herein, and such other and further relief as the Court deems just and proper.

Dated:  August 19, 2011
        New York, New York

**KING & SPALDING, LLP**

By: /s/ Mark W. Wege
        Mark W. Wege
        MWege@kslaw.com
        Eric M. English
        EEnglish@kslaw.com
        1100 Louisiana, Suite 4000
        Houston, Texas 77002
        Telephone:  (713) 751-3200
        Facsimile:  (713) 751-3290

        -and-

        Scott I. Davidson

SDavidson@kslaw.com
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222

**PROPOSED BANKRUPTCY COUNSEL TO THE DEBTOR**

## <u>CERTIFICATE OF SERVICE</u>

Notice of the foregoing was served by the Debtor upon: (a) the Office of the United States Trustee for this district and division, (b) the Series A-1 Noteholder Agent, (c) counsel for the Series A-1 Noteholder Agent, (d) the Debtor's unsecured creditors, (e) all other parties on the master service list proposed by the Debtor for this case, (f) counsel for any official or informal committees formed in this case, (g) any other entity who has requested notice under Bankruptcy Rule 2002, (h) all nondebtor parties to the Debtor's executory contracts and unexpired leases, (i) the Internal Revenue Service, (j) all parties known by the Debtor to assert a lien or security interest in the Assets, and (k) all parties who previously have expressed serious interest in acquiring all or substantially all of the Assets.

<u>/s/ Mark W. Wege</u>
Mark W. Wege